**Laurel D. CLANTON, Plaintiff,**

v.

**Nathaniel GLOVER, in his official capacity as Sheriff of the Jacksonville Sheriff's Office; City of Jacksonville, Florida; and River Region Human Services, Inc., a Florida corporation, Defendants.**

No. 3:01–CV–1398–J–32–HT.

United States District Court,
M.D. Florida,
Jacksonville Division.

May 9, 2003.

---

## *ORDER*

CORRIGAN, District Judge.

This case is before the Court on a Motion for Summary Judgment and a memorandum in support thereof filed by defendants Nathaniel Glover ("Glover") and the City of Jacksonville ("City") (Doc. 24); a Motion for Summary Judgment and memorandum in support thereof filed by defendant River Region Human Services, Inc. ("River Region") (Docs. 27 & 28); and plaintiff Laurel D. Clanton's Memorandum in Opposition to Defendants' Motions for Summary Judgment (Doc. 30). The Court heard oral argument on the pending motions on May 2, 2003 and now issues its written decision.

### I. Background

Plaintiff was sentenced to a term of community control on or about December 17, 1998 for the crime of obtaining or attempting to obtain a controlled substance by fraud (Complaint, Doc. 1 at 3). On or about December 14, 2000, plaintiff was sentenced to 12 months in the custody of the Sheriff of Jacksonville, Duval County, Florida, for violating the terms of her community control, with 94 days of credit for time-served (*Id.*). The court also recommended that plaintiff participate in a "secure drug treatment program" (*Id.*).

While she was in custody, plaintiff voluntarily agreed to participate in the drug treatment program operated by defendant River Region (Doc. 25, Ex. 9, Plaintiff's Response to Defendants Glover's and City's First Set of Admissions to Plaintiff). According to Janelle Bordelon, an employee of defendant River Region, who was plaintiff's counselor while she was at the treatment program (Doc. 25, Ex. 3, Depo-

sition of plaintiff at 50), the program typically lasts between 90 and 120 days and is designed to help inmates with addiction problems through education and therapy (Doc. 25, Ex. 2, Deposition of Janelle Bordelon at 6–8).[1] As part of the program, inmates are required to be part of group discussions where inmates discuss personal issues and provide feedback to each other (*Id.* at 8).

At the conclusion of the group meetings, there were "group closures" or "close-outs" (Doc. 25, Ex. 2, Deposition of Janelle Bordelon at 8–9), at which time the inmates placed their chairs in a circle and discussed their feelings about the day (Doc. 25, Ex. 3, Deposition of plaintiff at 52–53). Plaintiff testified that these close-outs were known by the inmates as the "prayer circle" (Doc. 25, Ex. 3, Deposition of plaintiff at 60). During these group closures, individual inmates took turns closing out the group (*Id.* at 9). Plaintiff testified that the group "was always closed by either the Lord's Prayer or the Serenity Prayer or both" (Doc. 25, Ex. 3, Deposition of plaintiff at 53). The recitation of prayer by the inmates lasted approximately 10 or 15 seconds (Doc. 25, Ex. 2, Deposition of Janelle Bordelon at 34). According to Ms. Bordelon, the program counselors neither conducted the close-outs nor directed the inmates what to say during the close-outs, but rather permitted the inmates to close out the group as they chose (*Id.* at 9). According to Ms. Bordelon, the purpose of the group close-outs was to foster unity among the inmates (*Id.* at 26).[2]

Plaintiff testified that, on one occasion, Ms. Bordelon told her that she "had to lead the prayer in group" because it was plaintiff's "turn to lead the prayer," but after plaintiff said that she did not want to do so, another inmate "just went ahead and started the prayer," and "the issue was dropped." (Doc. 25, Ex. 3, Deposition of plaintiff at 56–57). Plaintiff testified that she was never required to verbalize a prayer, but she was required to participate in the prayer by standing in the prayer circle and holding hands with the other inmates while one of the inmates recited a prayer (*Id.* at 60, 63 & 73). Plaintiff testified that her objection to the close-outs was "[h]olding hands or, you know, being in the group" (Doc. 25, Ex. 3, Deposition of plaintiff at 62). When asked if having "to stand apart from the group, not holding hands, but hear[ing] what the inmates had to say, including the prayer or religious statements they were making" would have been "offensive" to her, plaintiff testified:

A [plaintiff]: No, I don't think that would have been. Just as long as I didn't have to participate.

Q [defense counsel]: And just so I clarify specifically what you mean by "participate," that means to stand there and hold hands and listen to the others?

A [plaintiff]: Right. Or even not hold hands. In the end they said, well, I had to stand there, but they made it a rule that nobody held hands then. So that was the last few days I was there.

(Doc. 25, Ex. 3, Deposition of plaintiff at 62).

On February 20, 2001, plaintiff was disciplined for refusing to participate in a

---

1. Plaintiff was at defendant River Region's treatment program for approximately 30 days (Doc. 25, Ex. 3, Deposition of plaintiff at 58).

2. Ms. Bordelon testified: "When [plaintiff] came into the program, she signed the paperwork stating she would participate, and coming to participate in group closure is part of it. You know, you don't have to pray. And it represents the unity, that together we can do this; by ourselves we can't. You've just shared all these big secrets with me, and, you know, I'm still here for you. It represents that family, that unity, that togetherness" (Doc. 25, Ex. 2, Deposition of Janelle Bordelon at 26).

group close-out (Doc. 25, Ex. 2, Deposition of Janelle Bordelon at 18). The next day, on February 21, 2001, plaintiff was disciplined after she became disruptive during the group close-out (*Id.* at 25–26).[3] Plaintiff testified that she was "ostracized," "ridiculed," and "called names" by the other inmates for refusing to stand in the prayer circle (Doc. 25, Ex. 3, Deposition of plaintiff at 96). However, she testified that none of the counselors ever called her names (*Id.*).

As a result of her refusal to participate in the group closures, plaintiff was charged in two disciplinary reports by one of defendants Glover's and the City's corrections counselors. In the first disciplinary report, plaintiff was charged with disobeying a written or verbal order for refusing to participate in the close-out after being asked to do so by Ms. Bordelon (Doc. 25, Ex. 3, Deposition of plaintiff, Ex. 1). In the second disciplinary report, plaintiff was charged with disobeying a verbal order, refusing to obey rules, and "repeatedly knowingly and willingly refusing to obey" for refusing to "circle up for group closure" (Doc. 25, Ex. 3, Deposition of plaintiff, Ex. 2).

Inmates in the custody of the Duval County Sheriff's Office are awarded reductions in the time they must serve, known as "gain time," if they do not violate certain rules or commit certain misconduct (Complaint, Doc. 1 at 3–4). As a result of her first disciplinary report, plaintiff lost 20 days of gain time (Doc. 25, Ex. 3,

Deposition of plaintiff at 76). The loss of this 20 days of gain time meant plaintiff spent 20 additional days in confinement than she otherwise would have. She did not lose any additional gain time for the second disciplinary report (*Id.*).

Plaintiff also alleged that, as a result of the distress she suffered due to the disciplinary reports and the matters leading up to the disciplinary reports, she became physically ill and was unable to attend a Narcotics Anonymous meeting on February 21, 2001 that she had been directed to attend as part of the drug treatment program, which resulted in her being charged in another disciplinary report and losing 20 additional days of gain time (Complaint, Doc. 1 at 5).[4] Plaintiff further alleged that the disciplinary reports resulted in the denial of her transfer from a corrections facility to home confinement (*Id.*).

On December 11, 2001, plaintiff filed a complaint in this Court under 42 U.S.C. § 1983 seeking monetary damages, declaratory and injunctive relief, and attorney's fees and costs "to address the past deprivation and prevent the further deprivation by Defendants and their agents, acting under color of state law, of [plaintiff's] rights secured by the First and Fourteenth Amendments to the United States Constitution" (*Id.* at 1). Plaintiff alleges that "[t]he losses of [her] gain time imposed by Defendants violated [her] rights under the First and Fourteenth Amendments to be free from a governmental establishment of religion and to freely exercise her own religious beliefs" (*Id.* at 5).[5]

---

3. Plaintiff testified that she refused to participate in the group closure and that she was "very upset" and was "crying" (Doc. 25, Ex. 3, Deposition of plaintiff at 74).

4. The Court doubts whether the disciplinary action related to plaintiff's failure to attend a Narcotics Anonymous meeting itself constituted a constitutional violation. However, plaintiff may be able to recover for the loss of 20 additional days of gain time if she is able to

prove at trial that such loss was proximately caused by the alleged constitutional violation that occurred when plaintiff was disciplined for refusing to participate in the group close-outs.

5. Plaintiff denies that she had knowledge of the "religious content" of the program at the time that she agreed to participate (Doc. 25, Ex. 9, Plaintiff's Response to Defendants Glover's and City's First Set of Admissions to

By Order dated September 6, 2002, the Court dismissed plaintiff's claims for injunctive and declaratory relief as moot, because plaintiff was no longer incarcerated and thus was no longer subject to the group close-outs (Doc. 17 at 3).

On December 13, 2002, defendants filed Motions for Summary Judgment (Docs. 24 & 27). Defendants argue that plaintiff has suffered no constitutional deprivation because she was not coerced to engage in any exercise of religion, and defendants did not endorse religion. They claim that "[s]tanding passively as one of a group of fellow inmates in a voluntary group drug rehabilitation program during a brief close-out period lasting a minute ... while another inmate states a personal message of her own choosing (even a religious one), does not constitute a coerced 'exercise of religion' where no inmate is required to recite, join in, or otherwise believe in the message delivered, the message is not prescribed or controlled by prison officials or counselors, and the group close-out has the secular purpose of fostering unity and trust among its members battling addictions" (Doc. 24 at 8; Doc. 28 at 3). Defendants distinguish plaintiff's case from other cases in which courts have found Establishment Clause violations where inmates were compelled to attend mandatory treatment programs that were predominately based on religion. Defendants also argue that, to the extent plaintiff asserts a free speech or free exercise claim, such claim fails be-

cause the group close-outs were rationally related to the legitimate neutral goal of treating inmates' addictions (Doc. 24 at 17; Doc. 28 at 14). Defendants further argue that, even if a cognizable constitutional violation exists, plaintiff has failed to identify an official policy, custom, or practice of defendants that directly caused such violation (Doc. 24 at 18; Doc. 28 at 15). Defendant Glover also argues that, because he is sued only in his official capacity, and he is immunized from monetary liability as a matter of law, he is a superfluous party and should be dismissed (Doc. 24 at 20).

In her Memorandum in Opposition to Defendants' Motions for Summary Judgment, plaintiff argues that requiring her to "stand as a group" during prayer constituted a constitutional violation, particularly since her refusal to participate in the group close-outs resulted in her loss of gain time (Doc. 30 at 7). Plaintiff argues that "[t]he key issue is that Defendants offered no alternative substance abuse treatment program to the one that includes a religious component and punished religious dissent" (*Id.*).

## II. Summary Judgment Standard

"Summary judgment is proper where the pleadings, depositions and affidavits demonstrate no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Lowe's Home Centers, Inc. v. Olin Corp.*, 313 F.3d 1307, 1310 (11th Cir.2002) (citations omit-

---

Plaintiff). The only "religious content" mentioned in plaintiff's complaint, however, is the group prayer circle. At her deposition plaintiff testified that, during a lecture about "spirituality" and a "higher power" the inmates attended at the treatment program, she was "singled out" by one of the counselors (Doc. 25, Ex. 3, Deposition of plaintiff at 83, 91–92). She testified that the counselor said the "reason [plaintiff] was like [she] was was because of [her] relationship with [her] higher power" (*Id.* at 83–84). Plaintiff testified that the

counselor never mentioned plaintiff by name (*id.* at 85), but that "all the females knew he was talking about [her]" (*id.* at 90). Plaintiff does not, however, argue that this conduct by the counselor or the lecture about spirituality and a "higher power" violated her constitutional rights. *See* Doc. 30, Plaintiff's Memorandum in Opposition to Defendants' Motions for Summary Judgment at 4 ("[Plaintiff's] only objection was to participation in the prayer aspect of the program.").

ted). The Court must "'view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party.'" *Id.* (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1367 (11th Cir.1999)). "'The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial .... Where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented.'" *Stillman v. Travelers Ins. Co.*, 88 F.3d 911, 913 (11th Cir.1996) (quoting Notes to Fed. R.Civ.P. 56(c) of Advisory Committee on Rules, 1963 Amendment).

### III. Discussion

The Supreme Court has held that "[t]here is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Bd. of Educ. of Westside Comm. Schools v. Mergens*, 496 U.S. 226, 250, 110 S.Ct. 2356, 2372, 110 L.Ed.2d 191 (1990) (quotation omitted) (emphasis in original). While "[i]t is true that ordinarily religious speech by private parties cannot establish religion, even if it occurs in a public institution," it is also true "that private parties' religious speech can violate the Establishment Clause if the State uses such parties as surrogates to accomplish what the State may not do." *Chandler v. James*, 180 F.3d 1254, 1258–59 (11th Cir.1999) ("*Chandler I*") (citations omitted), reinstated by *Chandler v. Siegelman*, 230 F.3d 1313 (11th Cir.2000).

For example, in the school prayer context, the Eleventh Circuit has stated that, "if a school board may not constitutionally write and require students to recite a prayer, as it most assuredly may not, the school board may not avoid this prohibition by delegating this function to others." *Chandler I*, 180 F.3d at 1259 (citations omitted). "Nor may the State establish a policy which 'permits' private parties to speak, but then limits their speech to prayer or other devotional speech." *Id.* "[I]t is the *State's decision to create an exclusively religious medium* which violates the Establishment Clause; *not* the private parties' religious speech." *Id.* (emphasis in original). "It is not the 'permitting' of religious speech which dooms these policies, but rather the *requirement* that the speech be religious, i.e., invocations, benedictions, or prayers." *Id.* (emphasis in original). "Only when the speech is commanded by the State does it unconstitutionally coerce the listener." *Id.* at 1263.

The Eleventh Circuit has also held that, while private religious speech may constitute state action "if the State participates in or supervises the speech," it has also held that "[s]upervision cannot mean ... mere presence." *Chandler I*, 180 F.3d at 1264 & n. 19 (internal quotation omitted). "[F]or supervision to amount to unconstitutional endorsement, it must cross the line into active endorsement, encouragement or participation." *Id.* at 1264 n. 19.

In this case, the Court finds that there are unresolved factual issues regarding whether the group circles involved purely private speech by inmates or whether the state encouraged or required the group sessions to be closed in prayer. On the one hand, plaintiff's counselor, Ms. Bordelon, testified that the inmates closed out the groups the way that they wanted to close them out (Doc. 25, Ex. 2, Deposition of Janelle Bordelon at 9). Plaintiff also testified that "it was just the inmates" who would get in the group circle while "the officer would be right there at her desk" (Doc. 25, Ex. 3, Deposition of plain-

tiff at 52). Plaintiff further testified that it "was an inmate that would direct ... [the group close-out]" (*id.* at 52) and that "the officer didn't participate" (*id.* at 107).

However, on the other hand, plaintiff testified that every group circle was closed with prayer, and the close-outs were known as "the prayer circle" (Doc. 25, Ex. 3, Deposition of plaintiff at 60, 111). She further testified that, on at least one occasion, Ms. Bordelon told her that it was her "turn to lead the prayer" (Doc. 25, Ex. 3, Deposition of plaintiff at 56). When asked if she knew how an inmate "came to understand what was or was not the acceptable way to lead a close-out," plaintiff testified:

> Well, no. I mean, they—I think what I meant is they decided whether they—which prayer they were going to use. It was always, you know, the Lord's Prayer or the Serenity Prayer. You know, it was usually the same every night. You stood up and held hands and then that person, the person that was leading the prayer, would, you know, decide what prayer to use.

Doc. 25, Ex. 3, Deposition of plaintiff at 111.[6]

Viewing the facts in a light most favorable to plaintiff and drawing all reasonable inferences in her favor, the Court concludes that summary judgment is inappropriate because there are genuine issues of material fact regarding the level of the state's involvement in or encouragement of prayer at the end of the group sessions. Although defendants did not require plaintiff to verbalize a prayer, they did create a situation in which, day after day, the group sessions were closed in prayer under the counselor's watch, and all of the inmates were required to stand together as a group as the prayer was recited or else they would face a loss of gain time. Plaintiff should be allowed to attempt to prove at trial that such conduct was either an express or *de facto* state policy which endorsed or coerced religious activity.

The Court also rejects defendants' arguments that plaintiff's claim must fail at the summary judgment stage because she did not identify an official policy, custom, or practice of defendants that caused a constitutional violation or because the group close-outs were rationally related to the legitimate goal of treating addictions. There are factual issues concerning these matters which must be developed at trial.[7]

---

**6.** Many of the recent First Amendment cases upon which defendants rely in support of summary judgment involve school prayer. *See e.g., Santa Fe Indep. School District v. Doe,* 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000); *Adler v. Duval County School Bd.,* 250 F.3d 1330 (11th Cir.2001); *Chandler v. James,* 180 F.3d 1254, 1258–59 (11th Cir.1999), reinstated by *Chandler v. Siegelman,* 230 F.3d 1313 (11th Cir.2000). While these school prayer cases provide some guidance in the instant case, the Court recognizes that the prison context is necessarily different from cases involving prayer in schools. On the one hand, that plaintiff was an inmate may be helpful to her case because she could not choose to leave the treatment program once she agreed to attend and because she faced a loss of liberty if she refused to participate in the group closures. On the

other hand, that plaintiff was an inmate may be hurtful to her case in that prisoners necessarily lose some freedoms that they would otherwise enjoy in the outside world and prison officials are given substantial deference in enforcing good order and discipline. Also, unlike in the school prayer cases where the courts had before them a statute or written policy regarding prayer or other student-initiated speech, here there is no such written policy in the record. The absence of a written policy contributes to the creation of unresolved factual issues.

**7.** The parties stated at oral argument that the trial in this case is expected to last only two days. The Court believes that a trial will provide the necessary evidentiary development to resolve the disputed factual issues. However, the Court does not preclude the

The Court also rejects at this time defendant River Region's argument that it is not a proper defendant in this action because it was the City, rather than River Region, that made the decision whether or not plaintiff would lose gain time (Doc. 27 at 6). The extent to which defendant River Region participated in the alleged constitutional violation is a factual inquiry that must be answered at trial.

Finally, at oral argument, plaintiff stated that she was willing to have defendant Glover dismissed as a party if the City agreed that such dismissal would not affect plaintiff's ability to proceed against the City. The City agreed that, if defendant Glover were dismissed, this would not affect plaintiff's ability to proceed, and the City would not attempt to shift liability to the sheriff. Based upon this concession by the City, the Court will dismiss defendant Glover from this case.

After due consideration, it is hereby **ORDERED**:

1. Defendants Glover's and the City of Jacksonville's Motion for Summary Judgment (Doc. 24) is **GRANTED** to the extent that defendant Glover is dismissed from the case and is otherwise **DENIED**.

2. Defendant River Region Human Services, Inc.'s Motion for Summary Judgment (Doc. 27) is **DENIED**.

3. The Court will separately issue a Case Management and Scheduling Order.

possibility that, after the evidence has been presented at trial, the Court would be required to remove this case from the jury's consideration and rule as a matter of law that no constitutional violation occurred. In any event, by allowing a full record to be developed, the Court will facilitate review by the Eleventh Circuit in the event that this case is appealed by either side. Given that this case apparently presents an issue of first impression, this bolsters the Court's decision to deny summary judgment.